IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


**CADENCE BANK, N. A..,**

    **Plaintiff,**

vs.                                      Case No. 4:12cv38-WS/WCS

**MANAUSA HOLDINGS, LLC, et al.,**

    **Defendants.**

    _____/


## REPORT AND RECOMMENDATION

Plaintiff has moved for appointment of a receiver. Docs. 5 and 32. Defendants have responded. Docs. 36 and 37. An evidentiary hearing was held on March 29, 2012.

**Findings of Fact**[1]

On July 8, 2008, Defendants entered into a loan for $3,900,000 and mortgage for a 56 unit apartment complex at 830 East Park Avenue, Tallahassee, Florida, and

---

[1] These findings are based upon the testimony and the exhibits in evidence. P. Ex. 1 is the working loan file based upon financial statements supplied to Plaintiff by Defendants. P. Ex. 2 is a copy of the note and mortgage. P. Ex. 3 is information concerning the proposed receiver. P. Ex. 4 is an appraisal of the property dated September 6, 2011.

through a series of assignments, Plaintiff, Cadence Bank, N.A., now holds the note and mortgage. P. Ex. 2. Paragraph 20 of the mortgage contains an assignment of rents and rents are part of the collateral for the loan. P. Ex. 2, p. 8.

Defendant has not paid the agreed monthly payments on the loan (of about $12,000 to $15,000 per month) since March, 2011, and the March payment was one month in arrears. The note became due in June, 2011, and after a proper demand, has not been paid as promised. About $3,900,000 is due.

Paragraph 4 of the mortgage provides that Defendants will pay real estate taxes when due. P. Ex. 2, p. 2. Paragraph 13 of the mortgage provides that in the event Defendants do not pay the real estate taxes when due, Plaintiff may advance the money and the money advanced becomes part of the loan. *Id.*, p. 5.

In 2010, Defendants did not pay the real estate taxes of $42,055.99 on the property. Plaintiff paid them. P. Ex. 1, p. 11. In 2011, Defendants did not pay the real estate taxes of $41,456.70. Plaintiff paid them. *Id.*

In paragraph 17(a) of the mortgage, Defendants agreed for the procedures if Defendants default. P. Ex. 2, p. 6. Paragraph 17(g) provides that after default without cure as provided, Plaintiff

> shall be entitled, as a matter of right, to the appointment of a receiver of the Mortgaged Premises, and the court may appoint a receiver, either before or after judgment, without notice and without regard to the solvency of the Mortgaged Premises. Such a receiver shall have full power to collect the rents . . . and shall have all other powers necessary for the protection, possession, control, management and operation of the Mortgaged Premises. The receiver shall also have full power and authority, at the expense of Mortgagor, to maintain, restore and keep the Mortgaged Premises insured and to pay all taxes, assessments and other charges arising in connection therewith.

*Id.*, p. 7.

The property was appraised by Stephen A. Griffith, MAI, SRA, as worth $2,150,000 as of September 6, 2011. P. Ex. 4, p. 65 and testimony of Griffith. Griffith estimated that the net operating income for the property should be about $215,793 annually, after management fees and other expenses have been paid, and that money should be available for debt service. He said he inspected the property from the outside and found it to be in typical condition for an apartment complex of this age, with no major damage or deterioration.

Defendants intended to convert the property to condominiums, but the market fell in 2008 and that conversion and condominium sales proved to be impossible, so the units have been managed as rental units.[2] Four units were fully converted to condominiums as models. About 40 other units were worked on, with expenses incurred, in preparation for conversion to condominiums and then for rental.

In 2010, the property was about 60-70% occupied, and in 2011 to date has been almost fully occupied, a result of work by Defendants to manage the property as rental units. The gross rental income from the property was about $230,000 in 2010, about

---

[2] It would appear that had the 56 units been converted to condominiums and sold for $100,000 each, the profit would have been about $1.6 million ($5.6 million less $3.9 million). There was no evidence as to the expected sales prices, however, and it is immaterial to the issue before the court. I note this only to explain how the intended purpose of the venture, entered into by both Defendants and the bank that originated the loan with high hopes, fell through as the market for condominium sales plummeted in 2008.

$330,000 in 2011, and is expected to be $348,000 in 2012 according to the proposed operating budget.[3]

Defendants reported to Plaintiff that it had management expenses of $46,254.80 for the first seven months in 2011. P. Ex. 1, p. 10, item 6070. This was about $6,500 a month, or about 27% of gross rental income for this seven month period. The normal management fee for rental property of this type is 6 to 10% of gross rental income.[4] Defendants had hired Leparulo to manage the property, and from January through July, 2011, Leparulo was charging a management fee of 6% of gross rents, the normal rate for rental apartments, or about $1,500 per month. P. Ex. 1, pp. 14, 16, 18. The excess, from $5,000 to $5,500 per month, will be explained ahead.

The proposed operating budget for 2012 reports an expected management fee of $87,883, (about $7,200 per month) and expected rental income of $348,000. P. Ex. 1, p. 21. The proposed management fee continues to be 27% of rental income. There is a note that the management fee "can be scaled back now that occupancy has been restored." *Id*.

Joseph Manausa testified that during the first seven months of 2011, Defendants paid his wife $5,000 monthly as a management fee, bringing the total management fee expense for those months to about $6,500. He said that Defendants had paid other managers this extra $5,000 in earlier years. He said that his wife did this management work in 2010 and was not paid, and the payments in 2011 were to make up for the lack

---

[3] Joseph Manausa thought the income might be $360,000. The appraiser estimated a potential rental income of $400,000.

[4] The appraiser, Stephen A. Griffith, testified that the normal management fee for a rental apartment complex is 4 to 10 percent of gross rental income.

of payment in 2010.  He said that the renovation work on the 40 apartments was needed to make them rentable even though the plan to sell them as condominiums fell through.  He said that there was no contract with his wife or the other managers to cover this fee, but said that the bank who made the loan knew about it and never objected to these management fees.  He did not provide any documentary evidence to support the payments.

Mark Hinrichs, Plaintiff's Vice President for the special asset group, testified that Defendants have not supplied any documentation to support the payment of $5,000 to $5,500 as an extra management fee for the first seven months of 2011, and he was not aware that a monthly payment of $5,000 was going to anyone.   Hinrichs does not have documentation to support a proposed management fee of 27% of rental income for 2012.

There was testimony concerning utility expenses and whether those expenses are reasonable.  I cannot clearly ascertain those expenses in this report and recommendation since the units are not individually metered.  The tenants pay a prorated share of utilities in their rents, though some are on old leases and some are on new leases.

There is little evidence of any activity to convert the apartments to condominiums in 2011, and since the market crashed in late 2008, it is doubtful that there was any such activity in 2010 or 2011.  There may have been renovations to the 40 apartments to make them more attractive for rental, and perhaps some work to increase the occupancy rate, but on the whole, Defendants have not adequately justified the payment of $5,000 monthly to Mr. Manausa's wife as a management fee.  This is

$60,000 per year, which could have been used to make some payments on the monthly loan debt and the real estate taxes.

The proposed receiver, Robert Swett Consulting, L.L.C., would charge about $2,000 to as much as $15,000 for a setup fee, with the greater amount needed if Defendants did not cooperate in providing information to begin the receivership. He predicted a setup fee from $5,000 to $6,000. This expense is needed for a receiver to gather all of the information needed to manage and protect the property. He would charge a monthly management fee of from $2,000 to $3,000, replacing the $1,600 management fee currently paid to Leparulo. He said that the typical management fee is between 6% and 10% of rental income.

It is concluded that the property is in good condition. It is not damaged or in need of significant repair.[5]

**Conclusions of law**

This is a diversity suit. Doc. 7, amended complaint. The appointment of a receiver in a diversity action is governed by federal law. National Partnership Inv. Corp. v. National Housing Development Corp., 153 F.3d 1289, 1291-1292 (11th Cir. 1998); FED. R. CIV. P. 66. Appointment of a receiver *pendente lite* is an ancillary remedy. *Id*. It is an extraordinary equitable remedy available when there is no remedy at law or the

---

[5] The testimony of Swett, that the property was in poor to fair condition, is not persuasive. He said some of the screen doors had fallen off. Repair of a few screen doors would not cost much. He said there were weeds in front of some apartments. Those areas are maintained by tenants, and tenants sometimes do not take care of these small areas. He said two tenants left their doors open. That is not evidence of deterioration of the property.

Case No. 4:12cv38-WS/WCS

remedy is inadequate. United States v. Bradley, 644 F.3d 1213, 1310 (11th Cir. 2011), *pet. cert. filed*, December 12, 2011 (No. 11-844).

Federal courts have applied a number of factors to determine whether to appoint a receiver. The factors include whether there has been fraud, whether there is imminent danger that the property will be lost, the inadequacy of legal remedies, the probability that harm to the plaintiff by denial of appointment will be greater than the injury to the defendant, the likelihood of success on the merits, whether the plaintiff's interest may be irreparably injured without an appointment, and whether the interests of all will be well served by a receivership. Consolidated Rail Corp. v. Fore River Ry. Co., 861 F.2d 322, 326-327 (1st Cir. 1988) (cited with approval by the Eleventh Circuit in National Partnership, 153 F.3d at 1291).

Fraud has not been shown here, but the lack of documentation for the payment of the extra $5,000 to $5,500 a month as a management fee is troubling. The fee is plainly out of line for the normal cost for management of rental property. The evidence as to this factor weighs in favor of appointment of a receiver.

There is some danger that this property will be liquidated for failure to pay real estate taxes. This factor weighs significantly in favor of appointment of a receiver.

Plaintiff's legal remedies are profoundly inadequate. An action for damages cannot adequately compensate Plaintiff since the debtor on the note does not have the funds to make the payments as agreed. The only way to try to secure repayment of the loan is to manage the rental income so that those funds pay down the debt and taxes, and to stop the diversion of rental income to management fees. This factor weighs very heavily in favor of appointment of a receiver.

The likelihood of success on the merits is great. It is undisputed that monthly payments are in default for one year and that Plaintiff has not paid the real estate taxes for the last two years. Foreclosure is almost certain.

Plaintiff's interests may be irreparably impaired unless a receiver is appointed. The apparent diversion of rental income to unreasonable management fees must end, and the only way to end that pending the final outcome is to appoint a receiver.

The interests of most of those concerned will be best served by appointment of a receiver. Plaintiff has an interest in managing the property properly, protecting that collateral (the real property and the rents), and using the rents to pay down the loan and the real estate taxes. Those who are leasing the apartments now have an interest in the continued viability of the apartment complex. This factor weighs in favor of appointment of a receiver.

Applying all of these factors, the motion for appointment of a receiver should be granted.

Alternatively, the motion should be granted because it is a part of the mortgage. Plaintiff has shown that Defendants agreed to appointment of a receiver if default occurred. This contractual provision coupled with proof of default is enough to warrant appointment of a receiver. <u>Garden Homes, Inc v. United States</u>, 207 F.2d 459, 459–460 (1st Cir. 1953).

> "The courts have consistently read such clauses to permit the appointment of a receiver." *United States v. Am. Nat'l Bank & Trust Co. of Chicago*, 573 F.Supp. 1317, 1318 (N.D. Ill. 1983). *See also Garden Homes, Inc. v. United States*, 207 F.2d 459, 459–60 (1st Cir.1953) (upon prima facie evidence of default, court was empowered to appoint a receiver in accordance with the express terms of the mortgage); *Fed. Nat'l Mortgage Ass'n v. Maple Creek Gardens, LLC*, No. 09–14703, 2010 WL 374033, at

*2–3 (E.D. Mich. Jan.25, 2010) (slip op.) (finding that defendant's agreement in mortgage to the appointment of a receiver to take and maintain full control of mortgage property upon defendant's default "alone is sufficient to conclude that [plaintiff] is entitled to such appointment"); *United States v. Mountain Vill. Co.*, 424 F.Supp. 822, 825 (D. Mass.1976) (holding that "the plaintiff is entitled to the appointment of a receiver in accordance with the terms of the mortgage agreement"). Thus, under the express terms of the parties' agreements, Wells Fargo is entitled to obtain a court-appointed receiver to take possession of the defendants' property in Massachusetts and to "hold, manage, lease and operate" such property as deemed appropriate by Wells Fargo.

<u>Wells Fargo Bank, N.A. v. Walnut Equity Partners, LLC</u>, 2010 WL 1065004, *2 (D. Mass. Mar 17, 2010) (No. CIV.A. 10-10287-PBS).

**Conclusion**

The motions for appointment of a receiver should be granted. Since this is an emergency motion, the time for filing objections to this report and recommendation and responses to objections are shortened to 7 days.

Accordingly, it is **RECOMMENDED** that:

1. Plaintiff's motions for appointment of a receiver, docs. 5 and 32, be **GRANTED**.

2. That Plaintiff be **ORDERED** to file a proposed order for the appointment of the receiver and send a copy, in word processing format, to Judge Stafford's proposed order email at flnd_stafford@flnd.uscourts.gov.

**IN CHAMBERS** at Tallahassee, Florida, on March 30, 2012.

                s/    William C. Sherrill, Jr.
                **WILLIAM C. SHERRILL, JR.**
                **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 7 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 7 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**